and I represent Plaintiff Appellant Inge Smothers in this appeal against Rowley Memorial Masonic Home, Kate Clemish, and Christopher Seivkin, and separately in an appeal from a District Court order regarding the Department of Inspections and Appeals. My client started working for Rowley Memorial Masonic Home in 2013, no, excuse me, 2003. In the mid-20-teens, she entered into an arrangement with a resident, I.W., for privilege purposes, we're going to reference him by I.W. And when she came to this arrangement with I.W., the administration of Rowley Memorial Masonic Home was notified and aware that they were inside, that they had this arrangement that she would do separate work for him, such as laundering clothes, taking out the dog, various things that he and his children could not do, could not or would not do. She was paid for this, and it was found that it was perfectly fine and not a conflict of interest. In 2018, after Rowley Memorial Masonic Home entered into a contract for nursing administration and services with Continuum, a new administrator, Kate Clemish, came in and decided to question that finding. Now, Kate Clemish came in and immediately started terminating older employees. We provided an affidavit of Kayla Reesburg, who was an older employee who was terminated. There are additional interrogatories showing older employees were terminated, and my client was eventually suspended. It's on the counsel that most of your brief is focused on the age discrimination claim. You still, you have a national origin claim as well. What is the evidence? I just want to move you to that a minute because it seems like, on appeal here, it's almost all age discrimination. Is that correct? Yes, Your Honor. As I discussed with my client and we've decided to pursue the majority of the age discrimination claim. So are you waiving or forfeiting the national origin claim? Yes, at this time. Okay. Thank you. There was no briefing on it, so we believe it would be inappropriate to argue it at this time. A nursing shortage ensued after these older employees started being terminated. It should be noted by the court that my client was cleared of wrongdoing and younger employees were hired on after my client was cleared of wrongdoing after a suspension. Now. Counsel, when you say, you've said that older employees were let go and then you've said generally younger employees were taken on by the company. Are you saying to the exclusion of, for example, hiring younger to the exclusion of older and terminating older to the exclusion of younger? No, Your Honor. The records do show that there was a mass termination by Clemish at Raleigh Memorial Masonic Home. So if it's both, if it's a wide range of ages that are being either terminated and then hired, what does that do for your client's claim? Your Honor, the fact that my client was not reinstated during this same nursing shortage, well, whether younger or older employees, my client is aged. She was in her 60s at the time. What do you mean she wasn't rehired? Was this when the state investigation was ongoing or? After the state investigation cleared her, she was not re-brought in. She was suspended indefinitely without pay. And then the Department of Inspections and Appeals did an investigation into her claim, into the claim that Clemish and Siefkin filed, and then they cleared her of wrongdoing. The DIA investigator, Wendy Lemke, testified that she notified Clemish and Siefkin that my client could return to work, and, in fact, that it's quite common for nursing homes to do that very same thing, return her to work. Instead of returning her to work, instead, Clemish kept her suspended. Now, notably, Rowley Memorial Masonic Home, after the case was filed in the Iowa Civil Rights Commission, stated specifically that Ms. Mothers was terminated. Now, after the filing of this case, Clemish has said opposite of Rowley and said that Ms. Mothers was not terminated. Well, are you talking constructive termination or? I mean, she wasn't actually terminated, was she? It's one or the other, Your Honor. The fact is. Well, which one is it? One or the other. That's the point. We're arguing that it was both. It was either one or the other. The evidence of actual termination is based solely on the statement of someone with the state agency. Is that correct? It wasn't the state agency. It was, in fact, Rowley Memorial Masonic Home's statement saying that Ms. Mother was terminated. Okay, I'm sorry. I misunderstood. Okay, thank you. See, so Rowley Memorial Masonic Home responded to the Iowa Civil Rights Commission and said that Ingus Mothers was terminated versus Kate Clemish now under deposition makes a self-serving statement that the court weighed against plaintiff. And, Your Honors, this is the reason why we're appealing here today. It seems like the court decided to weigh many statements in favor of the individual defendants, even when the company defendants said the complete opposite and thereby required my client to go through this appeal. Despite the fact that she was terminated, they now say, well, she was never terminated. We would have reinstated her. We would have reinstated her once we got some written documentation. Well, the fact is Rowley Memorial Masonic Home, a year after this, actually did hire my client back after they said they terminated her. They hired her back without this official documentation that the defendants used to say, hey, you know, there's no way you can say pretext. We're always saying about the same thing. There's no way you can say shifting explanations. There's no way you can say that Ms. Mothers was terminated or constructively discharged because we always were going to bring her back. Well, that's beside the point. Too often it seems like district courts and defendants are saying to plaintiffs, you've got to do this extra hurdle. You've got to prove beyond pretext that your client was discriminated against. You know, a jury could honestly have found that the reason why Ms. Plemish didn't hire Ms. Mothers back was because of her age, maybe because of how much she was paid. Maybe she just didn't like her. Maybe she thought she was getting back at her because Ms. Mothers reported to the DIA about the abuses going on at Raleigh Memorial Masonic Home, which plaintiffs brought up in the retaliation claim but was never addressed by the district court. All of those things could have been done. Instead, the district court just casually said, hey, you know what? They're waiting for written documentation. It happened again in regards to the investigation that they say Christopher Seifkin did. Christopher Seifkin says in interrogatories, I didn't do an investigation. In deposition, he comes back. Counselor, I want to flesh out your argument a little bit and make sure I understand it. You're saying that are you attacking or criticizing the point in the analysis where the court says there was a legitimate non-discriminatory reason? Is that where you're arguing? Or are you saying there's somehow too high of a burden on the pretext aspect? Both, Your Honor. So at this point in time, first off, I believe as Reeves v. Sanderson plumbing indicates that the pretext could be shown by saying the legitimate non-discriminatory reason is unworthy of credence. In this situation, it is unworthy of credence. When a corporate defendant, a plaintiff, and a DIA investigator all say the same thing and the individual defendant says something different, why is it that the individual defendant's argument is being accepted over the three other parties, over the three other people? It's for this very reason that the — now, while we believe that pretext is appropriate, Your Honors, while we believe that the plaintiff created pretext and overcame this hurdle, it's the very same reason that the district court said that the plaintiff could not prove pretext, why this should be certified to the Iowa Supreme Court, Your Honors, based off the motion that we filed in September of 2021. At this point in time, in September of 2021, it was determined — the pretext decision was determinative. The key aspect is whether a federal court is genuinely uncertain as to whether this — whether something is settled in the state courts. Right now, there have been, even this year, three separate Iowa Court of Appeals decisions saying separately whether the motivating factor applies, whether McDonnell-Douglas applies, or whether they both apply. Are those jury cases or are those summary judgment cases? Summary judgment cases, Your Honor. Is there an Iowa Supreme Court ruling that's applied a different standard to summary judgment? Because I think our court has found that that's not the case, that the law has not changed until the Iowa Supreme Court says so. Yes, Your Honor, and this is exactly the reason why it should be certified because, as the Honorable Justice Kelly stated in Carter v. Atrium — in fact, I was arguing that back in the day — it said, absent further instruction from the Iowa Supreme Court, that we're going to stake with McDonnell-Douglas for Iowa Civil Rights Act claims. This is the perfect time to take it to the Iowa Supreme Court and say, hey, okay, what instruction do you have for us? It seems like your court of appeals don't know what's going on. Exactly. It seems like it's perfect time because there's an ambiguity in it, not to let — So are you saying that there are different courts of appeals in Iowa have done it differently at summary judgment? Yes, Your Honor. Let me pull them up. Stansbury v. Sioux City Community School District, July 20, 2022, and Caldwell v. Casey's General Store, 977 Northwest 2nd, both did McDonnell-Douglas, versus Feeback v. Swift Port Company, 977 Northwest 2nd, 520, and Watkins v. City of Des Moines, 949 Northwest 2nd, 28. Both said that it's both standards, both motivating factor and — At summary judgment. And motivating factor and McDonnell-Douglas. At summary judgment. At summary judgment. And what year were those latter two cases? One was 2020 and one was 2022. Coincidentally — So does the Iowa Supreme Court, do you know whether they have sought review? Have they shown any interest in that topic? Well, Your Honor, Feeback, which was decided in March of 2022, is up on further review. But whether the Supreme Court is going to answer that question, whether they answer the question of motivating factor or not during that period is uncertain. Obviously, we don't know what they took it up on further review for. And you know what? This is the perfect time. You send a motion to certify over to them, and they'll say, nope, send it back. We already got it covered. We're going to clear it up on this case. Or they'll just deny it outright. But, Your Honors, I see that my time is at one and a half minutes. I meant to reserve five minutes, so I'm going to go ahead and reserve the remainder of my time. Thank you. You may. You may. Ms. Dixit. Good afternoon. May it please the Court. Good afternoon. My name is Anagha Dixit, and I represent the Iowa Department of Inspections and Appeals in this matter. I will only be addressing the motion to compel issue. Your Honors, the question before you today is not whether you can compel this evidence. It's whether you should. Today, we ask you to affirm the magistrate and the district court for two reasons. First, the standard in this case is high. The plaintiff was required to show a gross abuse of discretion resulting in fundamental unfairness, and she's been unable to do so. And second, when the magistrate and district court applied the interest-balancing test to determine whose interests outweighed the other, they both resulted in the fact that the State's interest in protecting this information outweighed the plaintiff's interest in obtaining it. Turning to my first point, the gross abuse of discretion resulting in fundamental unfairness. For any level of unfairness to be here, a plaintiff had to be denied certain pieces of information. Unfortunately, she actually had all the information she needed from DIA. She needed to know that a complaint was filed against her for dependent adult abuse. That exists in the record. She needed to know that DIA completed an investigation. That exists in the record. She needed to know whether it was founded or unfounded. Again, that exists in the record. And finally, and most importantly for plaintiff, she needed to know whether the result that her dependent adult abuse allegation was unfounded was ever communicated to Defendant Rowley. Well, we have that on the joint appendix on page 270 as part of the exit interview conducted by Wendy Lemke, the investigator for DIA. She informs Rowley not only that the results of the dependent adult abuse investigation were unfounded, but that they can feel free to bring her back on if they so chose. She had everything she needed in order to establish her case. What she was looking for specifically in addition to that was information that the State has a high, high interest in protecting for public policy reasons and confidentiality reasons, which is why we asserted the privilege on this motion to compel. She was looking specifically for information such as who filed the complaint and what was filed. First of all, Your Honors, she actually also already has this information because on joint appendix pages 74 and 75, she has the copy of the complaint filed by Rowley, including the information they included about why they were alleging that the plaintiff may have committed financial exploitation. Then she wanted to know specifically what was told to the investigator at DIA as they were conducting this investigation. There's two problems with this, both of which are actually addressed when the magistrate court and the district court did this interest balancing test, which leads me to my second point, that the needs of the State outweigh the needs of the plaintiff. The burden to redepose would be high, and the interest that the State has in assuring a free flow of information, in ensuring that witnesses feel comfortable coming forward to DIA in order to conduct these investigations, in protecting the exact kind of information that plaintiff now seeks to compel. We see this in Hanson. We see this in Holland. We see this in Jaffe, that when the interest balancing is committed, is conducted, the interests of the State in this case, on a case-by-case analysis, outweigh the interests of the plaintiff. Can I ask a maybe slightly off-topic question here? DIA issued a written report. Is that correct? It did issue a written report as to the investigation committed at the facility itself, because in addition to the dependent adult abuse case, Wendy Lemke was also there to conduct what we call a survey or an inspection of the facility itself. So am I correct in saying that the written report, though, did not address the financial allegations? Is that correct? That's my reading of the record.  Why is that? Is that in the record? It's not in the record, Judge, but it is part of the statutory code, which is that 135C regulates these facility inspections, and 235B regulates dependent adult abuse. And because those two statutes are essentially separate in what they're, what inspections they're conducting, the reports would be separate. So in this case, the results of the dependent adult abuse case were actually communicated verbally by Ms. Lemke directly to the facility. And when was that done? It was done as part of an exit interview when she concluded her inspection of the entire facility. So it would be right after Ms. Lemke had been, or not Ms. Lemke, but the plaintiff had been suspended, but prior to her resignation. I see that my time has expired. Thank you. Please affirm. Thank you, Counsel. Mr. Olson? Good afternoon, Your Honors, and may it please the Court. My name is Ethan Olson, and I represent the appellees Rowley Memorial Masonic Home, Chris Sifkin, and Kate Klimisch in this appeal. Very briefly, Judge Kobus, you asked when that exit interview would have occurred. That occurred on June 22nd of 2018. One thing that I'd like to touch on before I launch into the merits of our case is the question about which standard should apply at summary judgment and some of the cases that Counsel has cited. In particular, Counsel cited the feedback case in which the Iowa Court of Appeals applied both McDonnell-Douglas as well as the motivating factor standard. But notably, Counsel has cited no case from the Iowa courts or any courts of this circuit in which only the motivating factor standard would have applied at summary judgment. In all cases, McDonnell-Douglas has applied. This Court has repeatedly held that McDonnell-Douglas is the appropriate standard at summary judgment, and that is a standard that the District Court properly applied in this case. Counsel also made reference to a potential termination of Ms. Mothers. Presumably, that refers to an email that Lisa Eastman, who is then the administrator of Rowley, sent to the Iowa Civil Rights Commission during the administrative phase of this litigation. In that email, what Ms. Eastman actually said was, we made no employment decisions whatsoever with respect to Ms. Mothers. She did reference a termination, but the context of that reference was, Rowley actually made no decisions with respect to the employment decision, the termination in this case. So why isn't that a constructive termination? I mean, as I understand it, sometime in June, your client had all the information from the State, the investigation was complete, and yet no action was taken vis-à-vis the plaintiff's employment status. She remained suspended. Is that correct? And about two, three weeks later, arguably she resigned or she realized she was terminated, however you want to describe it. What happened there? I mean, I don't think she was ever told, you can come back. She was never told, you can't come back. That's correct, Your Honor. And I think your question has two answers. I think the first answer is that at the time that this occurred, as Your Honor already has noted, Rowley had had no written information regarding the specific claim of financial, potential financial exploitation that was at issue here. And it was the administrator and the director of nursing's understanding that such information was going to be forthcoming. If you reference what's called the 2567 statement, as you already noted, that's not in there. And with respect to another employee who was under investigation for different circumstances, including something akin to neglect, she actually, with respect to her case, Rowley did receive a separate written communication with respect to her. So it was really an unfortunate misunderstanding that Rowley believed that they were going to be receiving this type of communication with respect to appellant, and they simply never did. But I'd also like to touch on this idea that the constructive discharge might have occurred in the first instance. I believe that the district court properly found that the circumstances, as they exist in this case, the suspension for, I believe it was 117 days, did not rise to the level of a constructive discharge. And this Court's own precedent in the Tatum case suggests that 120-day suspension without pay would still not rise to the level of a constructive discharge. And so for those reasons, no constructive discharge occurred here. And moreover, Your Honor, even if circumstances amounting to a constructive discharge exist here, appellant would still be required to demonstrate that there was some sort of improper motive behind the creation of those circumstances. And she simply cannot do that here. There's no evidence in the record to suggest that Rowley created the situation because of some sort of improper motive to her age. For example, if an employer decided that it wanted to create some sort of environment that was so bad that a reasonable employee wanted to quit, but it did so on the basis of something that's not impermissible, say an interpersonal conflict, as Mr. Soltzi noted, that would not — there would be no remedy in the civil rights laws for that. And so the demonstration of this improper motive is still necessary in order to prove a constructive discharge claim, which she has not done so here. Mr. Soltzi also referenced a nursing shortage and the hiring of other employees, which I believe Judge Kelly noted. There were, indeed, employees of all ages who were terminated, employees of all ages who were hired during this time, as the district court also noted. But also, there's an infirmity in this idea that there was some sort of nursing shortage, and that should have placed some sort of additional burden on Rowley to reinstate the appellant. First of all, the record citation that appellant has relied upon to establish that this nursing shortage existed is a single citation to the deposition of Kate Klimisch, who was the administrator at the time. All Ms. Klimisch said was that Rowley needed CNAs and that it needed good CNAs. That certainly doesn't establish that there was some sort of nursing shortage, nor does it establish that Rowley had some sort of impermissible motive lurking underneath its decision not to return Ms. Mothers to employment. What about focusing in on this sort of waiting for the written documentation, and you mentioned the 117 days. I mean, at some point, and then they ended up hiring her, right, without ever having written documentation? Am I correct on that? That's correct, Your Honor. But that occurred after Ms. Klimisch and Mr. Sifkin were no longer working with Rowley through continuum. It also bears noting, as we noted in our briefing, that Ms. Klimisch and Mr. Sifkin were very new to these administration roles. They didn't necessarily have the understanding of what the GIA was going to be with respect to each different type of investigation that occurred in this case. Well, is there anything in the record either, one, about sort of the pattern or the regular course of conduct from the agency to send something like this? Like, should they have been expecting it? And then secondly, is there some point in time where they should be following up? I mean, the record has e-mails and phone calls from smothers, like, do you have anything yet? What can I do? I'm out of money. I want my job back. So, you know, I guess that's a two-part question. Can you address that for me? Yes, Your Honor. With respect to the first portion of your question, there is some testimony in the record from Wendy Lemke about what she, her experience working with the GIA and what she thinks that others should know. Now, notably, there's nothing in the record that specifically relates to Mr. Sifkin and Ms. Klimich about what they did know or what they were told with respect to this type of documentation. And frankly, Your Honors, and as we noted before the district court in a briefing here, if Ms. Lemke wants to provide that sort of testimony, that's really the realm of an expert type of opinion. Talking about industry standards and proper training and what these people should know, and Ms. Lemke was not identified as an expert in the underlying litigation. And with respect to your second question, it's entirely possible that Rowley or one of its employees should have at some point decided to follow up and talk to the GIA and ask if there was going to be anything forthcoming. But, Your Honor, that doesn't necessarily mean, and critical to this case, that doesn't necessarily mean that their failure to do so is indicative of some sort of impermissible motive. There's just no other evidence in the record to suggest that that would be the case. With respect to comparator evidence, which upon which appellant relies heavily, one of the people that she discusses throughout her brief is an employee named Jan Robinson. This employee was the other employee who I mentioned who was suspended for misconduct and under investigation by the GIA during this time. And appellant uses Ms. Robinson to attempt to demonstrate two things. First, that she was reinstated as soon as she was cleared, or actually, in her reply, appellant alleges that she was reinstated before she was cleared and that she received back pay. However, you know, it's indicative of the way that appellant characterizes facts. If you look at the record, what actually occurred in this case was that Ms. Robinson was given her PTO paid out, which is exactly the same thing that happened to appellant. There's no actual reference in the record to either Ms. Robinson's reinstatement or the request that she be paid back pay. And I believe that's kind of emblematic of the way that this record has been shifted and talked about with reference to facts that aren't necessarily there. And so I would just urge Your Honors to look at the record closely and ensure that it says what the parties say that it says. And so for those reasons and the reasons included in our brief, we request that this Court affirm the district court's orders in whole. Thank you. Thank you. Counsel. Your Honors, may it please the Court. All right. So in regards to characterization of facts and that the facts show one thing or another, that really goes to the plaintiff's entire argument that the facts have been construed against the plaintiff, who is the non-moving party. Janice Robinson received, there was a letter to Janice Robinson and signed by Kate Clemish March 15th, 2018, indicating that she's entitled to back pay now. On March 16th, 2018, the DIA sends a letter clearing her of wrongdoing. So before that letter of clearing her of wrongdoing even happened, she got back pay. That's what the letter said. That's what the note said. For some reason, the defendants are still saying to you, hey, you know what? Construe it against plaintiffs. Please construe it against plaintiffs, even though the plaintiff is the non-moving party. They keep saying that there's an improper motive and that we need to prove that there's some sort of improper motive. That's still saying that plaintiff needs to prove direct evidence, despite the fact that all we have to prove is some pretextual analysis. And in regards to the motion to compel, Your Honors, in pages 19 through 21 of the brief no, excuse me, in the end of plaintiff's brief, plaintiff lists a whole bunch of questions that would pass the relevancy analysis of the district court. We did not believe the district court aired any of its analysis aside from the relevancy and weighing of the factors. For those reasons, we ask that you reverse the district court's rulings and remand for further proceedings. Thank you, Your Honors. Thank you.